IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

---

**UNITED STATES OF AMERICA**,

          Plaintiff,

v.

          No.1:99-CR-01338-BB

**ALFRED HEINZ REUMAYR**

          Defendant.

### MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant Reumayr's August 31, 2007 Motion to Dismiss Counts II Through VIII Because Alleged Conduct is Not a Crime [Doc. 107]. In the relevant counts, Reumayr is charged with attempting to destroy the Trans-Alaska Pipeline by means of an explosive, attempting to destroy an energy facility, aiding and abetting, as well as possession of a firearm in furtherance of a crime of violence. He now seeks to dismiss these counts of the indictment on the ground that the Court lacks subject matter jurisdiction. Reumayr, a Canadian citizen, argues that because he was at all times physically located in Canada and all the relevant conduct occurred in Canada, he cannot be charged with violations of United States law. Having reviewed the submissions of the parties and the relevant law, the Court finds that Defendant's motion should be **DENIED**.

### Background

The Trans-Alaska pipeline is one of the largest pipeline systems in the world, stretching from Prudhoe Bay to Valdez, the northernmost ice-free port in North America.[1] Prudhoe Bay, the largest oil field in the United States, is responsible for producing approximately 8% of U.S.

---

[1] Website of Alyeska Pipeline, the operator of the Trans-Alaska Pipeline, http://www.alyeska-pipe.com.

domestic oil production.[2]  The pipeline is owned by a consortium of publicly traded petroleum companies.[3]

The Government charges Reumayr with attempting to destroy the Trans-Alaska pipeline using explosives in order to stop the flow of oil along the pipeline. This attack was supposedly timed to coincide with the Y2K transition, and was designed to allow Reumayr to reap enormous profits from an investment in petroleum futures.  To accomplish these ends, the Government claims that Reumayr initiated email contact with James Paxton, an individual whom Reumayr met during time spent together in prison, and someone whom Reumayr knew to be an expert in explosives.  Paxton was a United States citizen residing in New Mexico.[4]

In his communications with Paxton, Reumayr is alleged to have developed an increasingly detailed plan to carry out the bombing, and to have sent approximately US$3,000 in six different Canadian postal orders to Paxton, in New Mexico, for the purchase of explosives ingredients.  The interactions culminated in a meeting between Paxton and Reumayr in Canada, at which Reumayr is alleged to have given Paxton explosives and unassembled explosive devices with the expectation that those devices would be assembled, armed, and placed at locations along the Trans-Alaska Pipeline selected by Reumayr.  Unbeknownst to Reumayr, Paxton contacted the Government soon after Reumayr's initial contact, and functioned as a Government informant for the entirety of Reumayr's contacts with Paxton.  Reumayr was arrested shortly following his meeting with Paxton, and was indicted and eventually extradited to the United States.

Reumayr contests his charges under 18 U.S.C. §844(i), Attempt to Destroy Property by Means of an Explosive; 18 U.S.C. §924(c), Possession of a Firearm in Furtherance of a Crime of Violence; and 18 U.S.C. §1366(a), Attempt to Destroy an Energy Facility.  He claims that Congress did not intend these statutes to extend extraterritorially, and thus they cannot reach his conduct.  Reumayr additionally contends that even should this Court find that these statutes reach

---

[2]*West Coast Can Handle Alaska Oil Outage -- For Now*, Energy Intelligence Briefing (August 7, 2006).

[3]Website of Alyeska Pipeline, the operator of the Trans-Alaska Pipeline, http://www.alyeska-pipe.com.

[4]Mr. Paxton passed away on November 15, 2007.

his extraterritorial conduct, such application would violate his Fifth Amendment due process rights due to an insufficient nexus between the United States and his conduct.[5] The Government maintains that the Court can infer Congressional intent to apply all three statutes extraterritorially and that the nexus between the United States and Reumayr is sufficient to withstand his due process challenge. The determination of whether Congress intended §844(i) and §1366(a) to apply extraterritorially presents issues of first impression. The Court will address each issue in turn.

## Discussion

**I. Extraterritoriality**

Defendant challenges the extraterritorial application of the statutes enumerated in his indictment.[6] The analysis of whether a statute applies to conduct outside the territory of the U.S. is a two-pronged inquiry: first the court must determine whether Congress intended the statute apply extraterritorially. If the court determines that Congressional intent is present, it next evaluates whether extraterritorial application of the law accords with international law. *U.S. v. Neil,* 312 F.3d 419, 421 (9th Cir. 2002); Brian L. Porto, Annotation, *Extraterritorial Criminal Jurisdiction of Federal Courts*, 1 A.L.R. Fed. 2d 415 (2005).

It is well established that Congress can regulate conduct outside the territorial boundaries of the United States. *See EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991). It is equally well established that the Court must presume that Congress has not intended that a statute apply to actions outside the territorial boundaries of the United States unless Congress shows clear extraterritorial intent. *See Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285 (1949); *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 173 (1993). In elucidating whether Congress intended extraterritorial application of a statute, courts first look to the plain language of the statute. The court is not limited to the language of the statute, however, and may consider "all available

---

[5]The Court does not address Defendant's Sixth Amendment or venue arguments as these claims are more appropriately addressed in Defendant's motions specific to these topics.

[6]Defendant does not challenge Count I of the indictment, brought under 18 U.S.C. §2332b, Acts of Terrorism Transcending National Boundaries, as he recognizes that Congress has made this statute explicitly extraterritorial. [Defendant's Motion at 10-11]

evidence about the meaning of the statute, e.g., its text, structure, and legislative history." *U.S. v. Bin Laden*, 92 F. Supp. 2d 189, 193 (S.D.N.Y. 2000) (quoting *Sale,* 509 U.S. at 188) (internal quotations omitted). The Supreme Court has additionally established an exception for criminal statutes not logically dependent on a locality for jurisdiction, and where limiting the locus of the statute to the territorial jurisdiction of the United States would severely curtail the scope and usefulness of the statute. *U.S. v. Bowman*, 260 U.S. 94, 98 (1922); *see also Sale,* 509 U.S. at 177. When faced with such a statute the court may infer extraterritorial intent from the nature of the offense described in the statute, and need not depend upon its legislative history. *Bowman,* 260 U.S. at 98.[7]

Once the Court has determined whether Congress intended to apply a statute extraterritorially, it must next evaluate whether extraterritorial application comports with international law. A state may always proscribe "conduct that, wholly or in substantial part, takes place within its territory." Restatement (Third) of Foreign Relations Law §402 (1987) (hereinafter Restatement); *see also Church v. Hubbart*, 6 U.S. 187, 234 (1804). International law recognizes five other principles of jurisdiction by which a state may reach conduct outside its territory: (1) the objective territorial principle; (2) the protective principle; (3) the nationality principle; (4) the passive personality principle; and (5) the universality principle. *U.S. v. Yousef*, 327 F.3d 56, 91 n.24 (2d Cir. 2003)*; see also,* Christopher L. Blakesley, Extraterritoral Jurisdiction in M. Cherif Bassiouni (ed.), International Criminal Law 50-81 (2d ed. 1999).[8]

While courts have held that ultimately Congress may override international law in choosing to extend a statute extraterritorially, *Yousef,* 327 F.3d at 91, *U.S. v. Yunis*, 924 F.2d

---

[7]Legislative intent is not irrelevant under the *Bowman* standard, but rather *Bowman* allows a court to infer Congressional intent where the legislative history and context do not make this intent clear. Should Congress evidence clear intent to apply a statute exclusively territorially, a court may not reach a contrary conclusion based on *Bowman.*

[8]Once a court has found Congressional intent to apply a statute extraterritorially it then analyzes the applicable international law principles. *See, e.g.,U.S. v. MacAllister,* 160 F.3d 1304*,* 1308 (11th Cir. 1998) (objective territorial principle); *U.S. v. Vasquez-Velasco*, 15 F.3d 833, 840-41 (9th Cir. 1994) (objective territorial and protective principles). *U.S. v. Benitez*, 741 F.2d 1312, 1316-17 (11th Cir. 1984) (passive personality and protective principles); *U.S. v. Yunis*, 924 F.2d 1086, 1091(D.C. Cir. 1991) (passive personality and universal principles).

1086, 1091 (D.C. Cir. 1991), generally speaking courts "presume that Congress does not intend to violate principles of international law.... [and] in the absence of an explicit Congressional directive, courts do not give extraterritorial effect to any statute that violates principles of international law." *U.S. v. Vasquez-Velasco,* 15 F.3d 833, 839 (9th Cir. 1994) (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21-22 (1963)).

*A. Defendant's Argument Regarding A Presumption Against the Extraterritoriality of Statutes Protecting Private Individuals and their Property*

As an initial matter, Defendant wishes this Court to read *Bowman* as creating a presumption against the extraterritorial application of statutes that affect private rather than Government property. [Defendant's Motion to Dismiss at 8]. Defendant supports this contention by noting that *Bowman* states, "[c]rimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and fraud of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." 260 U.S. at 98. Defendant's reliance on this language is, however, misplaced. Notwithstanding the Supreme Court's language in *Bowman*, courts have not refused to apply the *Bowman* analysis to crimes against private individuals where the crime at issue implicates a security interest of the United States. *See, e.g., U.S. v. Layton*, 855 F.2d 1388, 1395 (9th Cir. 1988) (applying *Bowman* to infer Congressional intent to reach murder of members of Congress abroad); *U.S. v. Felix-Gutierrez,* 940 F.2d 1200, 1204 (9th Cir. 1991) (applying *Bowman* to infer Congressional intent to reach murder of DEA agents committed abroad); *U.S. v. Bredimus*, 234 F. Supp. 2d 639, 647-50 (N.D. Tex. 2002) (applying *Bowman* to infer Congressional intent to extend child pornography statute extraterritorially). Indeed*,* rather than draw arbitrary lines, courts evaluate whether the underlying rationale of the *Bowman* decision is met, a rationale which "rests on two factors: (1) the right of the United States to protect itself from harmful conduct -- irrespective of the locus of this conduct, and (2) the presumption that

Congress would not both (a) enact a statute designed to serve this protective function, and -- where the statute proscribes acts that could just as readily be performed outside the United States as within it -- (b) undermine this protective intention by limiting the statute's application to United States territory." *Bin Laden,* 92 F. Supp. 2d at 194.

To the extent Defendant argues that the Government can have no security interest in private property, the Court roundly rejects such a contention.  As the events of 9/11 have shown, attacks the Court might note were primarily on privately owned property, the distinction the Defendant wishes this Court to draw between the Government's protective interest in private as opposed to public property is without merit, and one which the Court refuses to make. With the above principles in mind, the Court will next address the extraterritorial application of each statute challenged by Defendant.

*B. Extraterritorial Application of 18 U.S.C. §844(i)*

The Indictment predicates counts two, four, and six on 18 U.S.C. §844(i) which states in relevant part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both...
> 18 U.S.C. §844(i) (1999).

The plain language of the statute twice specifically refers to "interstate or foreign commerce."   The definitional section applicable to §844(i) defines interstate or foreign commerce as "commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, and commerce between places within the same State but through any place outside of that State. "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone)." 18 U.S.C. §841(b).  Defendant argues that the use of the word "foreign" in this context does not manifest Congressional intent to reach extraterritorial conduct, and notes that Congress could not have intended to provide a criminal remedy for damaged property anywhere in the world that has ties to the stream of

6

commerce. [Defendant's Motion to Dismiss at 12]. The Government maintains that the inclusion of the word foreign indicates an intent to address commerce between the states and outside the borders of the United States. [Government's Response at 16].

While Defendant correctly notes the potential overbreadth of reading the inclusion of the word "foreign" to implicate any explosion anywhere in the world, the issue before the Court is not such an explosion. Rather, Reumayr is charged with attempting to damage a vital conduit of interstate and foreign commerce located within the United States. Thus the sole issue which the Court must address is whether Congress intended §844(i) to reach an *attempt* partially from outside of the territorial boundaries of the United States to destroy property inside the United States. To determine Congressional intent regarding this particular issue, the Court will first look at the legislative history of the statute.

    *i. Legislative History*

The section that is currently 18 U.S.C. §844(i) became law in Title XI of the Organized Crime Control Act of 1970, Pub. L. No. 91-452. Title XI has the stated purpose of establishing federal controls over the interstate and foreign commerce of explosives, strengthening federal criminal law with respect to the illegal use, transportation or possession of explosives, and proscribing malicious damage or destruction by explosives of real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. H.R. Rep. 91-1549 (Sept. 30, 1970). While situated in the Organized Crime Control Act of 1970, Title XI was actually not present in the original bill, S. 30, 91st Cong. (1970), as passed by the Senate, January 23, 1970. 116 *Cong. Rec.* S585-607 (1970). The original bill had only nine titles and focused exclusively on strengthening the laws applicable to organized crime, particularly the mafia. *See id*. Title XI became part of the bill in the House, and emerged primarily from two bills, H.R. 18573 and H.R. 16699, 91st Cong., 2d Sess., introduced by Representative McCulloch. 116 *Cong. Rec*. H35198 (1970). These bills did not focus on organized crime, but rather addressed a different issue, namely the increasing number of bombings around the country by groups such as the Weathermen, Black Panthers, Students for a Democratic Society, and the Puerto Rican Independence Movement. *Hearings on H.R. 17154, H.R. 16699, H.R. 18573 and Related Proposals to Amend Title 18 of the U.S.C. to Provide for Better Control of Interstate*

*Traffic In Explosives, Before Subcommittee No. 5 of the House Committee on the Judiciary*, 91st Cong. 64-68 (1970) (*hereinafter House Judiciary Committee Hearings*); *see also,* 116 *Cong. Rec.* H35197 (1970) (Statement by Rep. Celler noting that Title XI was fashioned by the House Judiciary Committee to combat the recent rash of bombings around the country).

In terms of the specific use of the language "interstate or foreign commerce," there are several discussions in the House Judiciary Committee regarding the scope and breadth of the word "commerce." Throughout the Committee discussions, the Representatives were very concerned about writing a provision within Constitutional boundaries but broad enough to reach the majority of the bombing incidents. *See, e.g., House Judiciary Committee Hearings* at 56,[9] 304.[10] Thus while the provision originally proscribed the explosion or attempted explosion of "any building, vehicle, or other real or personal property used for business purposes," the Representatives expressed concern that the term "business purposes" was overly restrictive. *House Judiciary Committee Hearings* at 74. The Representatives therefore purposefully extended the reach of the statute to property "used in any activity affecting commerce" noting that "[i]n view of the very wide interpretation given "affecting commerce" by the courts, subsection (f)

---

[9]For example, during the statement of Mr. Wilson from the Department of Justice regarding H.R. 16699, Representative Rodino was very interested in whether specific language in the bill as drafted would cover bomb threats leading to evacuations, as had occurred multiple times in the Federal building in Newark. Due to language confining the provisions regarding interstate commerce to business properties, Mr. Wilson in response noted "I don't believe [H.R. 16699] would cover either public buildings or private homes under normal use." As a result this language was left out of the final version of the bill, as discussed in greater detail below.

[10]Mr. Cramer: In recent months there has been a shocking increase in bombings and other forms of related violence across the length and breadth of our land...I believe in answer to a question asked earlier, yes, it should be broadened to include any destruction of property.
   The Chairman: You are a good constitutional lawyer. We would like to have enlightenment. Have we the power to do that, to cover every bit of personal or real property destroyed by explosives?
***
   Mr. Cramer: These explosives have traveled in interstate commerce. I think that is an adequate basis for this legislation and action by the Congress of the United States...
   The Chairman: I am as anxious as you to proscribe all bombings. I am a little concerned whether or not the Congress has that power.

would practically cover every business property in the Nation." Statement of Rep. Mayne, *House Judiciary Committee Hearings* at 120.

Geographic breadth was also clearly of some concern, and the Representatives discussed making the geographic scope of the statute broader than in other areas of Title 18, and specifically extending its reach to Puerto Rico. *House Judiciary Committee Hearings* at 71 (Statement of Rep. Abbell noting that commerce, as defined in two other places in Title 18, did not include commerce with the Commonwealth of Puerto Rico, while proposed bill H.R. 16699 specifically included such commerce). The inclusion of Puerto Rico was important to the Committee due to testimony by the Department of Justice that the Puerto Rican Independence Movement had used incendiary devices in New York and Puerto Rico. *House Judiciary Committee Hearings* at 66.  It seems clear from the overall tenor of the discussion as well as the specific movement towards expanding the definition of interstate or foreign commerce to Puerto Rico that Congress was intent on reaching, punishing, and preventing domestic bombings wherever they originated.  The legislative history, therefore, strongly suggests legislative intent to reach attempts from outside the United States, to prevent bombings within; however, as Congress does not make such an intent explicit in the statutory language, the Court will additionally apply the *Bowman* analysis to determine extraterritorial intent.

>    *ii. Bowman Analysis*

Under *Bowman,* the Court is not limited to the legislative history but may also infer Congressional intent to apply the provision extraterritorially if limiting the locus of the statute to the territorial jurisdiction of the United States would severely curtail the scope and usefulness of the statute. *Bowman,* 260 U.S. at 98.  It is clear from the House Judiciary Committee hearings that Congress intended not only to punish but also to prevent attacks with explosives, that the section on explosives was meant to be "preventative as well as punitive. Before the fact as well as after the fact." *House Judiciary Committee Hearings* at 58.  The discussions regarding Puerto Rico evidence that Congress was not unaware at the time the statute was passed that such attacks could be planned just as easily without the territory of the United States, as defined statutorily, as within . *See House Judiciary Committee Hearings* at 71.

Certainly the evolving nature of domestic terrorist attacks has shown that a crippling act of domestic terrorism may just as easily be planned by Saudi members of Al-Qaida residing in Pakistan as by a homegrown Timothy McVeigh. The scope and usefulness of the statute would be severely curtailed without the ability to reach attempted attacks on domestic commercial property where the planning and a substantial step are consummated outside the territorial boundaries of the United States. In addition to the Congressional dialogue discussed above, the Court must infer, under *Bowman,* that Congressional purpose requires §844(i) be applied extraterritorially.

*C. Extraterritorial Application of 18 U.S.C. 924(c)(1)*

Defendant next challenges the extraterritorial application of §924(c)(1) in counts three, five, and seven of the Indictment. 18 U.S.C. §924(c)(1) states in relevant part, "any person who, during and in relation to any crime of violence or drug trafficking crime...for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime...be sentenced to a term of imprisonment of not less than 5 years." In the Indictment, Reumayr's §924(c)(1) charges are predicated on his charges under 18 U.S.C. §844(i). Generally, a statute ancillary to a substantive offense statute is presumed to have extraterritorial intent if the underlying substantive offense statute is determined to have extraterritorial intent. *See, Bin Laden,* 92 F. Supp. 2d at 197; *see also, U.S. v. Felix-Gutierrez,* 940 F.2d 1200, 1204-05 (9th Cir. 1991) (finding that the extraterritorial application of 18 U.S.C. §3, accessory after the fact, depends upon the predicate offense); *Chua Han Mow v. U.S.*, 730 F.2d 1308, 1311 (9th Cir. 1984) (noting that "[t]his court...has regularly inferred extraterritorial reach of conspiracy statutes on the basis of a finding that the underlying substantive statutes reach extraterritorial offenses.") The Southern District of New York specifically addressed the extraterritorial application of §924(c) in *Bin Laden,* and found that the §924(c) charge applied extraterritorially as a result of its conclusion that the predicate charges under 18 U.S.C. §844(f)(1) and §844(f)(3) applied extraterritorially. *Bin Laden*, 92 F. Supp 2d at 201. As Reumayr's §924(c)(1) charges are predicated on his charges under §844(i), and the

Court has found that the relevant provisions of §844(i) apply extraterritorially, the Court finds that §924(c)(1) applies extraterritorially and reaches his conduct.[11]

*D. Extraterritorial Application of 18 U.S.C. §1366(a)*

The Indictment predicates count eight on 18 U.S.C. §1366(a) which states in relevant part:

> Whoever knowingly and willfully damages or attempts to damage the property of an energy facility in an amount that in fact exceeds or would if the attempted offense had been completed have exceeded $100,000, or damages or attempts to damage the property of an energy facility in any amount and causes or attempts to cause a significant interruption or impairment of a function of an energy facility, shall be punishable by a fine under this title or imprisonment for not more than ten years, or both.
> 18 U.S.C. §1366(a) (1994).

*i. Legislative History*

The provision that eventually became §1366(a) was originally passed as part of the Comprehensive Crime Control Act of 1984, PL 98-473. The provision was part of Chapter X, Miscellaneous Violent Crime Amendments, essentially a hodgepodge of unrelated criminal amendments. In the Senate Report on the particular provision regarding the destruction of energy facilities, the Senate noted that "historically, damage to utility facilities has been a matter of concern for state and local law enforcement authorities. In recent years, however, acts of violence and sabotage against these facilities have been so widespread that some states have not been able to mount an adequate response. Moreover, the destruction of expensive facilities, such as electrical transmission towers, can occur in rural areas where law enforcement authorities are unable to deal with the situation and where the crime can affect the transmission of power into several other states." S. Rep. No. 98-225 at 325 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3501. The essential purpose of the section was thus to protect the nation's power supply by federalizing the criminal destruction of energy facilities.

---

[11] Defendant does not challenge the 18 U.S.C. §2 charges, but it is worth noting that they would be governed by the same analysis and thus also apply extraterritorially.

*ii. Bowman Analysis*

Congress does not give any indication in the text or legislative history as to the extraterritorial extension of this criminal statute. However, as noted throughout this opinion, a court may infer extraterritorial application where limiting the locus "to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute." *Bowman,* 260 U.S. at 98. The United States has long had an energy relationship with Canada and both countries have shared the power generated by the Niagara Power Project at Niagara Falls for nearly half a century.[12]  Indeed, Canada and the U.S. have operated an integrated electricity grid since the 1960s[13] and Canada is a major supplier of electricity to New England, New York, the Upper Midwest, the Pacific Northwest, and California.[14]  Given the historical and present interdependence and cross-border nature of energy production in the United States, the scope and usefulness of this section would be greatly limited if the Government's ability to protect energy facilities ended at the United States border.

Defendant argues that the Court may not infer Congressional intent to apply §1366(a) extraterritorially because Congress recently specifically included §1366 in the definition of the federal crime of terrorism in 18 U.S.C. §2332b, Acts of Terrorism Transcending National

---

[12]*See* New York Power Authority Webpage, http://www.nypa.gov/facilities/niagara.htm.

[13] While the United States and Canada had a partially integrated electricity grid prior to the 1960s, the full scale integration of the electricity grid appears to have been accomplished during the 1960s.  *See* North American Electric Reliability Corporation Webpage, http://www.nerc.com/about/history.html; Huge Power Grid to Get Test Feb. 7; U.S., Canada Plan to Link Major Electric Systems, *N.Y. Times,* January 26, 1967, at A23.  As a result of the integration of the electricity grid, a power supply issue in one country can have devastating consequences in both, resulting in cross border blackouts. *See,* Federal Power Commission, *Report to the President by the Federal Power Commission on the Power Failure in the Northeastern United States and the Province of Ontario on November 9-10, 1965* 1-6 (1965) (finding that the power outage which affected 30 million people in the United States and Canada and plunged most of the northeast into darkness originated in energy facilities in Ontario, Canada);  Lessons From a Blackout, *N.Y. Times,* April 12, 2004 (noting that the August, 2003 blackout that left 50 million people in the United States and Canada without power appears to have originated in Ohio).

[14]*See* United States Embassy in Canada Webpage, http://canada.usembassy.gov/

Boundaries, which has an explicit extraterritorial clause. Essentially Reumayr wishes the Court to conclude that Congress did not believe that §1366(a) applied extraterritorially on its own accord, and consequently added the provision to §2332b in order to extend the provision extraterritorially. [Defendant's Reply at 4]. The Government wishes the Court to reach the opposite conclusion, and infer Congressional intent to apply the statute extraterritorially from its inclusion in §2332b. [Government's Response at 17]. As the two provisions describe separate crimes, the Court does not find that §2332b assists in either a positive or negative inference of Congressional intent.

Title 18 U.S.C. §2332b, passed as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132 (April 24, 1996),[15] creates a new crime for acts of terrorism transcending national boundaries. As defined by the statute, activity proscribed under §1366 falls within the definition of the federal crime of terrorism where the action is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. §2332b(g). 18 U.S.C. §1366(a), in contrast, has no such intent requirement. Congress thus has not used §2332b to extend §1366 extraterritorially, as Defendant maintains, but rather has defined a new crime which Congress has explicitly made extraterritorial. As the statutes describe different crimes, this statute consequently has no bearing on the extraterritorial analysis of §1366, which is governed by the *Bowman* analysis, and the two may be considered separately. *See, e.g., Bin Laden*, 92 F. Supp. 2d at 199-201 (finding no evidence that Congress considered lack of explicit extraterritorial language in 18 U.S.C. §844 when passing anti-terrorism legislation in 18 U.S.C. §2332a and thus passage of anti-terrorism legislation was not dispositive of extraterritorial intent of §844).

---

[15]Defendant states that Congress did not add §1366 to the definition of the federal crime of terrorism until 2001 with the Patriot Act, and then uses this statement to argue for an inference against extraterritorial application of §1366 prior to 2001. [Defendant's Reply at 4]. The Court finds this statement and the subsequent argument puzzling as it seems clear that Congress added §1366 to the definition of the federal crime of terrorism when §2332b became law in the version of AEDPA passed in 1996, Pub. L. No. 104-132, 110 Stat 1214, and not in 2001 with the passage of the Patriot Act.

The Court finds under the *Bowman* analysis that Congress intended §1366(a) to apply extraterritorially.

*E. Congress's Exercise of Jurisdiction and International Law*

After reaching the determination that Congress intended each provision to apply extraterritorially, the Court must next evaluate whether this extension of Congress's jurisdictional reach is consistent with international law.[16] This determination requires the Court to analyze whether international law allows Congress to reach an attempt by a foreign national outside the territory of the United States to blow up an energy facility located in the United States. The Court finds that Congress may do so under the protective principle of jurisdiction.

Under the "protective principle" of international law Congress may reach "certain conduct outside its territory by persons not its nationals that is directed against the security of the state or...other state interests." Restatement (Third) of Foreign Relations Law §402(3). The protective principle applies where the defendant's conduct may have "potentially adverse effect on the sovereign's security or its governmental functions." *U.S. v. James-Robinson,* 515 F. Supp. 1340, 1344, 45 (S.D. Fla. 1981); *see also* 44B Am. Jur. 2d *International Law* §69 (2007). Reumayr maintains that the Government can have no such security interest in privately owned

---

[16]As noted previously, customary international law has established five principles of jurisdiction by which a state may reach conduct outside its territory: (1) the objective territorial principle; (2) the protective principle; (3) the nationality principle; (4) the passive personality principle; and (5) the universality principle. The objective territorial principle allows Congress to reach "conduct outside [U.S.] territory that has or is intended to have substantial effect within its territory." Restatement §402(1)(c). The protective principle allows Congress to reach "certain conduct outside [U.S.] territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests." *Id.* at §402(3). The nationality principle gives Congress the ability to reach "the activities, interests, status, or relations of [U.S.] nationals outside as well as within [U.S.] territory." *Id.* at §402(2). The passive personality principle recognizes the ability of Congress to reach "an act committed outside its territory by a person not its national where the victim of the act was its national." *Id.* at §402 comment g. Finally, the universality principle allows Congress to "define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism" regardless of the locus of the offense. *Id.* at §404; *see also, Yousef*, 327 F.3d at 103-04.

property. [*See,* Defendant's Motion at 8-9, 16]. While cases discussing the extent of the protective principle are few, courts have construed the protective principle to extend to cases of drug trafficking, even where the traffickers have not yet caused any effect inside the country, *U.S. v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987) (noting that "[d]rug trafficking presents the sort of threat to our nation's ability to function that merits application of the protective principle of jurisdiction"); the murder of a U.S. Congressman in Guyana, *U.S. v. Layton*, 509 F. Supp. 212, 216 (N.D. Cal. 1981); and most notably, the destruction of commercial aircraft to influence U.S. foreign policy, *Yousef, supra,* 327 F.3d at 110. In each case, the court determined whether to apply the protective principle by evaluating whether the crime at issue implicated a security interest or governmental function of the United States.[17]  *See, e.g., Peterson,* 812 F.2d at 493-94. Evaluating Reumayr's conduct with this in mind, the Court finds that an attempt to destroy a domestic energy facility, with the purpose of disrupting oil supply and as a corollary U.S. financial markets, is a crime that implicates a security interest of the United States and is thus cognizable within the protective principle of international jurisdiction.

---

[17]The protective principle does have its limits. In one of the few cases to deny jurisdiction under international law, the Fifth Circuit held that the protective principle does not give a court jurisdiction over the attempt of a Mexican national in Mexico to sell a car stolen by someone else in the United States. *U.S. v. Columba-Colella,* 604 F.2d 356*,* 359 (5th Cir. 1979). However that crime is a far cry from the crime at issue in the instant case, namely the attempt to destroy an important conduit of petroleum located within the United States, a crime which clearly implicates the fuel security and financial security of the United States.

## II. Extraterritorial Application and Defendant's Fifth Amendment Due Process Rights[18]

Reumayr additionally argues that extraterritorial application of §844(i), §924(c)(1), and §1366(a) violate his Fifth Amendment due process rights. Reumayr contends there is an insufficient nexus between the criminal conduct alleged and his contacts with the United States and thus extraterritorial application of United States law violates due process. Reumayr also argues that the application of an American criminal statute to a non-citizen in a foreign country results in a lack of notice sufficient to raise due process concerns. [Defendant's Motion at 10].

While many defendants argue that extraterritorial application of U.S. law violates their Fifth Amendment due process rights, it appears that no federal court has invalidated the extraterritorial application of U.S. law on due process grounds. Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process,* 105 Harv. L. Rev. 1217, 1221 n.12 (1992). In analyzing whether extraterritorial application violates due process, the Ninth and Second Circuits have adopted the strongest statement of due process rights, and have held that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *U.S. v. Davis,* 905 F.2d 245, 248-49 (9th Cir.1990).[19] The *Davis* court went on to hold that "[w]here an attempted transaction

---

[18]Defendant argues in his motion that it is not Constitutional for the Government to prosecute a case where most of the physical evidence and witnesses are located in foreign countries. [Defendant's Motion at 23]. To the extent this is a statement of law, the Court would note that this is simply incorrect. *See, e.g., Yousef*, 327 F.3d at 112 (finding that prosecution of foreign nationals charged with conspiring to blow up American and non-American aircraft in the Philippines did not violate due process). To the extent that Defendant is anticipating an inability to have favorable witnesses present in his defense, the argument is premature, as there has not yet been a trial where such witnesses were unavailable, and the Court will not address it at this time.

[19]The First and the Third Circuits have rejected the *Davis* nexus test. These circuits have found that due process is satisfied as long as application of the law is neither arbitrary nor fundamentally unfair, regardless of a nexus with the United States, and have looked to principles of international law to make this determination. *See U.S. v. Cardales*, 168 F.3d 548*,* 553 (1st Cir. 1999) (application of U.S. law contemplated under international law, thus application did not violate due process); *U.S. v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d. Cir. 1993) (defendant's conduct condemned in all nations, thus application of U.S. law consistent with due process).

is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction," *Id.* at 249. The court then found a sufficient nexus for due process purposes where a non-U.S. citizen captured in international waters intended to smuggle narcotics into the United States. *Id.* Applying this standard in *Yousef*, the Second Circuit found a sufficient nexus where non-U.S. citizens conspired to hijack and bomb U.S. aircraft in Southeast Asia. *Yousef,* 327 F.3d at 112. The Second Circuit reasoned that given the "substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." *Id.* Reumayr allegedly reached out into the United States during the planning stages of his attack numerous times via email, and the alleged purpose of his criminal activity was to violently disrupt the United States petroleum and financial markets. As Reumayr's contacts with the United States are more substantial than the defendants in *Yousef* and *Davis,* his prosecution is consistent with due process under the *Davis* standard. Since *Davis* appears to be the most stringent analysis for extraterritorial due process in federal jurisprudence, the Court finds that Reumayr's prosecution under these charges does not violate his Fifth Amendment due process rights.

Defendant's notice argument similarly fails. Reumayr cannot seriously maintain he failed to realize that his conduct was criminal, and the violent destruction of property for the purposes alleged is part of a subset of crimes universally condemned. *See, e.g., Martinez-Hidalgo*, 993 F.2d at 1056*; Bin Laden,* 92 F. Supp. 2d at 218-19.

### III. Conclusion

For the reasons discussed above, Defendant's motion to dismiss will be denied.

### ORDER

A Memorandum Opinion having been filed this day, it is hereby ORDERED that Defendant's motion to dismiss (Doc. 107) be, and hereby is, DENIED.

Dated this 10th day of January, 2008.

                                                   BRUCE D. BLACK
                                                   UNITED STATES DISTRICT JUDGE